My name is Mike Stanley. I'm here today on behalf of Appellants Max and Scott Hulse. We're here in the courtroom today. They're before this court because Amendment 4 to the Scallop Fishery Management Plan, the License Limitation Program, effectively pushes them out of the Alaska scallop fishery. It's demonstrated in the record that it's not economically viable for them to fish in statewide waters with a single 6-foot dredge. And the economics of the Cook Inlet fishery are not sustainable for a vessel to make a living there. Thus, far from enjoying the stable economic environment that was the goal of the LFP, the Hulses are precluded from fishing for scallops anywhere in Alaska on an economically sound basis. And I thought to illustrate this, I wanted to just refer to a low-tech, I realized, chart that I prepared to discuss economics. I've given you a little handout, and I've also given it to counsel that just illustrates this. This is information that's in the record. I'm just putting it up to try to enhance the argument. This first equation on top refers to break-even fleet size. That is essentially the same equation that the counsel and NMSE used when they did a break-even analysis for the statewide fishery. They used 650 a pound versus the quota of 800,000 divided by average income, and they came up with the figure, and I'll talk about that in a minute. If they had done that same analysis for Cook Inlet, this is the kind of equation they would have been looking at. And it's part of our contention that they didn't do that. They did not undertake that analysis, even though they had this information available to them. They had the price, they had the quota, they had the figure for average break-even income for a Cook Inlet vessel. They didn't perform this analysis. If they had, this is what it would have shown, is that the fishery will support a half of a vessel or less. Now, the government will say it's not a fair comparison because 135,000 figure in the denominator was indicated by Mr. Copland, who submitted the information for the Northern Explorer, that that support was for the whole fishery, whereas Cook Inlet, the numerators only Cook Inlet. That's a fair criticism. I would accept that criticism. And if the council had undertaken to make this analysis, I would have expected that information to come out. The point we are making, they simply did not do this analysis. They did this analysis for the statewide fishery. They never took a look at the ramifications of confining some vessels to Cook Inlet. It's our contention that this is by the international standard, too, and that it was unfair and inequitable. The bottom equations on this chart are just to sort of, again, illustrate, again, why we are here today. If you look at, even if the full 20,000 pounds of scallops in Cook Inlet is caught at 650 a pound, you have a total excess of value for the fleet of 130,000. Divide that by the three or four vessels that fish there, then the figure that's noted in the EA and the FRFA, and you get, you know, $43,000, $33,000 per vessel. You relate that against the break-even income, you see that you're down to less than 20% of what a Cook Inlet vessel needs to break even, the same standard that the council and NIMS applied to the statewide vessels. So it's really our argument here today that NIMS failed to come to grips with this problem. They failed to really think about what they were doing to these vessels that they were restricting in using a single six-foot dredge. They just didn't look at it, and we, again, contend that that violated the national standard, too, and that it was unfair and inequitable. I now want to turn to the break-even analysis, which is the—this is the other national standard issue argument we make. The linchpin of what the council did regarding the size of the fleet that they were going to allow out into statewide waters was this break-even analysis, and I've discussed this in the briefs, and I'm not going to go into it in any more detail. This, by the way, that I just put up, this is the attachment one to the brief that I put on the brief. It's defined at ER 142, or, anyway, it's taken from that page. What I've done here on this table is just reproduce exactly the two tables of data that were produced in the EARIR IRFA. The top table is the 1993 data. The bottom table was the 1998 data. The difference being is that in the 1993 data, the top table they calculated an average, and they got an average break-even income, and then they used that figure in developing their matrix and in coming to their conclusion about the optimum size of the fleet in statewide waters. Well, with respect to the 1998 data, they did not calculate the average, so I've calculated the average down at the bottom of this chart for informative purposes. Again, I discussed this in the brief, and it's in the attachment one to the brief, but what you see is that if they had done the same thing for the 1998 data that they did for the 1993 data, they would have had a different denominator in their formula, and the significance of that really comes down to this, Your Honor, because when they used the 1993 data, this is the formula. This is the formula that's indicated throughout the record that led them to conclude that they could allow no more than seven vessels out into statewide waters. This analysis was referenced by the council. It was referenced in the EARIR IRFA. It was referenced by NIMS when it published the final rule. They said we cannot allow more than seven vessels to go out into statewide waters with the full complement of gear because to do so would prevent attainment of the break-even fleet size. That's what they said when they published the final rule. What I've shown here is that if you use the 1998 data and not calculate a different calculated average of average break-even income, you end up with a different outcome. You end up with the conclusion that, well, we can have eight vessels that could fish out there in an economically sustainable way. I have a couple of questions about the break-even analysis. Was the break-even analysis raised at the administrative hearing? Was it? Well, I should say in terms of- It was presented to the council at the- Okay. The difference between 93 and 98. The two tables were certainly available to me. Again, look at ER 142. That was the analysis that was presented to the council. The council had those two tables, the 93 data and the 1998 data. Essentially, what the analysis said is, well, here's some newer data, and they did nothing with it. That's what we say is the flaw. I thought that some of the newer data that they used, like I thought there was a number of landings or some of these things that they used the 98 or the more recent data on, but then they ultimately reverted to the 93 data overall. Is that right? No. No. They did use 1998 data in the numerator. They updated the price of scallops, and they updated what they thought the quota would be. So they did, and this is what Judge Sedgwick, in his opinion, referred to as the key factors. Undoubtedly, those variables are very important, but what we've tried to stress is that the denominator is also important because the smaller the denominator, the larger the quotient, and that if they had used this other average break-even income figure, you would have reached a different conclusion. And you say, well, one vessel. What's the difference that that made? The decision to approve one option over the other, and this is very clear in the record. Council members referenced it. It's referenced in the EA. It came down to one vessel. They said, if you do this, the wayward wind, which was the Hulst's vessel, is in. If you go for either recent or historical participation in the outside waters, but if you go this other way, a more restrictive way, the Hulst's are out. And this defends taking the Hulst's out on the grounds that, well, to do anything different would prevent attainment of the break-even complete size, but that rests on this conclusion that seven vessels in the statewide fishery is what you get. And then, I mean, a lot of this, you can imagine, we're trying to sort out these charts. And so then I thought the government said, well, no, actually, if we took some of the 1998 data into effect, you'd actually get a lower number of vessels. Well, what the government is arguing is that, well, you shouldn't calculate an average with this line in there. They say you shouldn't include the cook in that vessel because it's not representative of statewide. And our argument is that, well, but they were part of the statewide fleet. The council had let them out into the statewide water, so why shouldn't they be included in the calculation? In addition, if you look at this top table, there's these 288 cook vessels in 1993. Well, those vessels are gone by the time we get to 1998. This 1998 data is not only more recent, it's more representative of the situation that was confronting the council. So just so I'm clear, in the multiple data that was submitted, the 1998 data is taken into account to some degree in the numerator, but not the denominator. Is that a good summary? That's correct. Okay. And it's not as if the council or NIST said, and this is why we are doing that. There's no explanation. You know, we recognize the Lesson of Fishermen's Doc case, that if they make an explanation and they offer a justification, they say, well, we wanted to use the 1993 data for this reason. You know, that would be perhaps a different case, but there was no explanation. And, again, we think that, you know, that it's important to remind the council and NIST that they do have an obligation to use the best available information. It's National Standard 2. You know, National Standard 1 is prevent overfishing. National Standard 2, the second priority is use the best scientific information available, and they failed to do that in this case, and it could have been critical for the Hulses. I want the court to just think for a minute about the implications of giving NIMS a pass on this issue. The argument would be that then, while they're free to ignore newer data and not provide an explanation, you know, the council has embarked on a very broad program of limited entry, adopting LLP. There are a few programs in the Alliance versus Brown case. There's a lot of ramifications to this. People's lives are being affected. Businesses are being affected. And it's important, we think, for them to use the best available information. And what if the issue weren't economics but conservation? Would anybody say, yeah, it's okay to use five-year-old data and not provide an explanation for ignoring newer data? Nobody would go along with that. But you certainly can't accept it in this case. Economic data is scientific information, just like conservation information. Biological information should be used similarly. I'll just kind of conclude my opening remarks with the observation that the, you know, the Secretary of Commerce is supposed to be a service of check on the councils and to ensure the decisions by the councils are consistent with the national standards. You know, NIMS' role is not just a rubber stamp of what the council has done and then perform the ministerial task of turning council action into regulations. You know, they've got a substantive role in assuring that the national standards are met. And with all due respect, I don't think NIMS did that in this case. I think they failed to fulfill that responsibility vis-a-vis what the council did. Instead, I think what we see, and this is reflected in particular in the documents at ER 204, 206, 207, we see an agency that's preoccupied with getting this rule in place on time. You know, the economists came up and told them, you know, you can approve this EA. And one of the ways you can approve it is by looking at this bottom line, that if this bottom line changes, the denominator, that'll change the potion. NIMS, well, we can't, we don't have time to do that. We're in a hurry. We've almost run out of time on this rule, is one quote. It's a powder keg waiting to blow, is another quote. Another quote, worried about the timeline. The agency is preoccupied with getting this rule in place on time instead of their substantive duty to make sure that the national standards are adhered to. And it's argued that in this circumstance, this is a prime case for the court to remind NIMS and the counsel of their duty to enforce the national standards and to send this case back down with that directive. Thank you. Thank you. I'll reserve the rest of my time for rebuttal. May it please the court, I'm Catherine Barton with the Justice Department. The purpose of a limited license program is to eliminate overcapacity and overcapitalization and excess harvest capacity in the scout fishery here. At the time that NIMS and the counsel were considering adopting this limited access program, the fishery had seemed to reach an equilibrium where the current level of effort could be sustained at a general break-even level across the board. And so the counsel and NIMS decided to basically adopt the status quo and allow vessels to continue to fish at their current, at a level that mirrored their current commitment to the fishery and their current economic dependence on it. And thus it allowed them to continue using, basically what's at issue here is the gear restrictions that was placed on the hulses and it allowed the hulses to continue to use the gear that they had been using not only in the past three years that constituted the qualifying period during which the gear limitation was based, but over the past decade. The larger gear that they want to be allowed to use that is the basis for their action here underlying it, they haven't used for more than a decade. So that was an eminently reasonable and fair decision that complied with all the statutory requirements. It's really the hulses that have come both to the counsel and to the court and to NIMS and said we should be allowed, we alone should be allowed to increase our capacity over what we had been doing, what anybody had been doing in the, I mean what we had been doing in the fishery at the time in the recent years before there were the limitations. Now let me get to the best scientific information question, the standard two. First of all, this argument should be precluded because it was not raised before the agency. The hulses were represented by Mr. Stanley in agency proceedings and he did not raise any of these scientific information arguments and Vermont Yankee precludes the court from addressing them now, especially in a circumstance where the strongest emphasis of their argument  but the agency had no idea that anybody considered that that information had to be used and it does leave us at a disadvantage. We do not have in the record why it seemed apparent to the economist who prepared the breakeven analysis who did look at updated information, decided that this piece of updated information did not need to be included. But there are reasons that we can suggest as to why it wasn't included and that was because it was, first of all, this information, NIFA only has access to this information if it's provided voluntarily and it was voluntarily provided by the seven vessels in 1993 that approximated the average size of the vessel and the fleet. So the point of the breakeven analysis is to... I don't get your point on that because I've sat up here and listened to NIFA also say in other situations that we recognize it's not perfect but we use voluntarily provided information and it was appropriate in this case. Right, right. No, I don't mean to say... So I'm not quite sure why it wouldn't be appropriate. Right, right. I'm just trying to say that... Okay, I didn't... I'm just trying to inform the court that it's not that the index can go out each year and check all this information. They used what they had which was provided in 1993 and then there were some updates in 1998. This one, it included an atypical vessel that had fished entirely in Cook Inlet until 1998 when it may have had some statewide application. I understand it's a vessel that does not fish all year full time, full year round, and the point of the breakeven analysis was to determine what could the statewide fishery sustain. Now let me point out another point about the denominator here is that it is the factors in the numerator. It is the landing and prices and it says this in the record in the description of the breakeven analysis that those are the primary factors that change the breakeven analysis. Indeed, the breakeven analysis initially showed that nine vessels could participate in the fishery and when it was updated with the more current information, it showed that six vessels could participate. One question I had, I saw that those were two primary factors and that there was use of, as he indicated, the updated pricing information. Although this mixing and matching might have some rationale, in the case that both parties cite to this Brown case out of Fourth Circuit, one of the reasons that they upheld the decision there was because it was articulated why certain evidence was chosen and certain evidence was not. Is there anything in the record here that shows why there's a mixing and a matching? No, Your Honor, that's exactly my point of the problem is that not having been raised in the agency proceedings is that it certainly could have been something that seemed evident to the economist, but that didn't seem, and this was presented multiple times to them. It's not that the hostels were not aware of this. They just never had a problem with it until they were cut out of the fishery, frankly. And so all I can do, because the agency wasn't put on notice, is suggest why he didn't see it as an issue to be addressed that was a problem, and that is because these, the landings and the price. Are you saying that nowhere in the proceeding below was the issue of 98 versus 93 data as a whole raised? Exactly. It was never raised. None of the compliance with standard two, the scientifically available information, none of those arguments, which was the entire crux of his argument before this court, was raised before the agency. So he would have to get around Vermont Yankee. That was exactly my preliminary point, isn't it? And that is why the record is deficient here in terms of the attacks they're bringing. It's exactly the kind of thing, the kind of springing the surprise on the agency that Vermont Yankee is intended to avoid. The agency has not had an opportunity to exercise its expertise here, and it may seem to outsiders now that it should have been addressed, but I believe because he did address the factors that were the most volatile and changed the most. And let me fundamentally go finally to this. It wouldn't change anything. This is not this. This part that is in the chart is 800,000 pounds. It's not the basis in which the government determined that it was approximately six to seven vessels. If you break even analysis and let me cite you to a page. You need to speak into the microphone. Excuse me. We record the recording. I see. In the excerpts of record page 235, for example, the break-even analysis appears several times. It notes that statewide landings averaged 735,000 pounds. Average price during the same period was approximately 6.5 pounds. Based on this more recent information, approximately six vessels could participate full time. If you do the math, that number comes out to the break-even analysis. It comes out to 5.8. That's what they did to come up with approximately six vessels. Now they point in the chart. Because the math is complicated, you're always dividing by 824,000 or 735,000 or whatever the number is. They did a chart to show at certain levels of landings and certain levels of price where it would come out so that the council and the decision makers could look at it and decide how much leeway they had based on what figures were put in. But just because there's a 6.3, you know, 800,000 figure in the chart, it comes out to 6.3. That's not what they used. So we have – and actually if you do the math with the correct figures in theirs, it comes out to 6.3. So it's the difference between 5.8 and 6.3. So all I'm trying to say in this – it ultimately doesn't make any difference. And I believe that the economists who prepared this analysis didn't deem the change in cost figures to be as volatile and as important and came up with a reasonable analysis. And also let me say that the breakeven analysis was confirmed – was consistent with public testimony by the fishermen in the field that they were operating at breakeven, that this was the – that the current level of effort was the current level that could be sustained. It wasn't solely – I mean, all the decisions weren't just basically on, oh, these are the latest numbers and we're going to always assume it's 6.5 per pound and it's – you know, it's a generalization. It's an approximation that needs a guide. So I think for all those reasons that NIST did use the best scientific data here should not even be held to justifying this issue that wasn't raised. And the decision makers had good information to rely on in making that decision. Now, the other point he raised about the Cook Inlet – a breakeven analysis for Cook Inlet. Again, that's part of their standard two argument, which was not raised to the agency. So the agency was never – it was never suggested that the agency should prepare a separate analysis for Cook Inlet and that issue should not be decided by the court. But at any rate, the whole point of the effort was to determine what the – of the breakeven analysis was to determine what level could be – of vessels could operate in the statewide fishery. The statute does not require that the government somehow assure that every vessel in the fishery can operate at breakeven or make money. I mean, there are vessels that are different sizes. They have different financial burdens with mortgages or not mortgages. I mean, there are a whole variety of issues. So what they did was they focused on the statewide fishery. Now, also, I mean, the HOSUs had only operated for the last 10 years in Cook Inlet. Other – there were several other vessels that had only operated in Cook Inlet. It just – without it being raised that there was – to the government that there was a problem or to the council with the economics in Cook Inlet, it seems reasonable just to assume that the Cook Inlet vessels were having some kind of success in Cook Inlet, that it made sense for them to operate there. But going beyond common sense, the HOSUs also testified to the council that they could make it in the Cook Inlet fishery. I think I lost my marker here. Let me – I would like to give you the record site for that. You could just provide it afterwards as a piece of paper to all – to council. Okay. It is – it's on – excerpts of record page 169. And they say that it's close, that they can make it in Cook Inlet. They said it's close, but by definition, that's what breakeven is. If you breakeven, it's close. And they said under the right circumstances, there's a sufficient catch there. So first of all, we don't believe – Does that presume two active vessels in the – in Cook? Well, I don't know what their testimony assumes. There were four, I believe, at the time operating in Cook Inlet, and one was eliminated in the – excuse me? As one went away, I know. Yes. Yes. One, I believe, had only fished in 98 and had to have two years qualifying between 96 and 98 to stay in the fishery. And there were – you know, any time you do a limited access program, somebody gets limited and somebody has complaints. The complaint here of the Hulsos is that they weren't allowed to increase their capacity to a level they hadn't fished in over a decade. Everybody – it was absolutely fair. They have another argument that they were – it was not a fair and equitable program, but it treats all individuals similarly situated the same. You can continue doing what you were doing in the period 96 through 98. And they opted to stay in the Cook Inlet fishery throughout that whole decade. They have some circumstances that caused them difficulties in doing – in fishing statewide, but other people overcame those difficulties, and at times they did make choices to just fish in Cook Inlet when they were not limited. I believe unless there were other issues in the brief that were not raised in the opening arguments, I won't address those unless there are any questions. Very well. Thank you. Okay. Thank you. I first want to address the Vermont Yankee argument. This argument by the government saying they were precluded from raising these issues of these flaws in the analysis, they didn't raise that in the district court. And it's our convention that under the well-accepted rules set forth in U.S. v. Oregon and other cases outlined in our brief, they can't raise it for the first time on appeal. So – and part of the problem is that they come up with two cases here that we believe don't support the proposition again for the reasons set forth in our brief. And more to the point, if you look at the cases, Vermont Yankee and the other cases that they cite, all those cases involve administrative tribunals, quasi-judicial proceedings, or some kind of formalized proceeding where a party has intervened, where there's complaints, there's witnesses, there's – in other words, it's akin to a judicial proceeding or a quasi-judicial proceeding. You know, Vermont Yankee was nuclear licensing. A party had intervened. It participated in a formal evidentiary hearing. In Tucker Truck Lines, which is cited at page 21 of their brief, it was a licensing – I think an ICC, old ICC licensing case. And again, there had been a complaint. There had been witnesses. There had been a hearing. In the Chrysler case that they cite, it was an appeal of a special project licensing that had special procedures that parties intervened. And, indeed, there's a whole list of cases. The Johnson case, for instance, that they cited in footnote 5 on page 22 of their brief, that was a workers' comp case. These are all cases where it's more like a judicial process. And just like in a judicial process, if you don't raise it at the trial level, you can't raise it on appeal. And that's the point we're making here, that they can't raise this argument on appeal because they didn't raise it at the trial level. That is a far different situation from a Magnuson Act kind of a testimony and APA rulemaking. They cite no case for the proposition that in APA rulemaking, if you don't, and you make a public comment on the rule, on a particular problem with the rule, therefore you're foreclosed from judicial review of that rule. There's no authority for that proposition. They're trying to take Vermont Yankee completely out of context and extend it to a rulemaking context, and that just doesn't work if you look at the cases. And when you really think about the policy that they're trying to suggest here, in a brief they say the failure to use 1998 data was, quote, readily apparent, and the failure to consider the, quote, inland economics was, quote, manifest. In other words, it's obvious. Mr. Spruill saw it. Their own economists saw that there was a problem if you had a different denominator. What they're kind of saying is that, well, yeah, we realize that the flaw was obvious, but unless you tell us it's obvious, we can't be held accountable. What's the public policy served by that? They have a need to undertake the analysis properly in the first instance. They don't need to be reminded of it again. Their own economists saw it. I suppose the question of when things are raised has to do with whether they're raised at a time when the deficiency could be remedied easily. If it's raised at the administrative level, then they can do something about it. If it's first raised in the district court, you just start all over again. Well, and but in this case, you have your their own economists raise the question of the denominator, if you will, the question of the average operating costs. And this is if you look at it, it's that series of documents. You are two or two or three. And then and then a response. And basically the deputy head of the agency at that time says we don't have time to consider this. So it was raised administratively, albeit after the council had had made this decision. But it was raised in time for this to do something about it. But now we don't have time to deal with this. You know, we've got to get this rule in place. It's a powder keg waiting to blow. I want to address the one other point that council made about that. All that happened here is the council adopted the status quo. That's not correct. What happened is that when they first looked at this, the alternatives, the recent participation period was 1996 and 1997. They got a plea from a Cook Inlet vessel. Hey, I fished for the first time in 1998. This is the Northern Explorer. Let me in. Let me in. The council let him in. They expanded the recent participation period specifically to allow that vessel to be able to fish. And so to suggest that they just adopted the status quo is not supported by the record. There was inconsistent treatment of those two vessels. They took the one vessel and they said, yeah, you can go out there, even though you bought a latent license, which we think is a problem, and even though we've been specifically warned that this may complicate the economics out there, but we'll let you go out to the statewide fishery and you can use the full complement of gear or whatever your boat will handle. But when it comes to the Hulses, another Cook Inlet vessel, sorry, you're out. The idea that they just adopted the status quo is not correct. They allowed one statewide vessel or one cook in a vessel out. They kept another cook in the tendon. But it did expand to make the additional year across the board. It just happened to affect one vessel. Well, I think this one would. But in other words, they didn't say all vessels are subject to having to show that they operated in a two year period. If this vessel gets to show that it operated within a three year period, they said any vessel that that's correct, your honor. But they were the only vessel that was affected. There was no other vessel that benefited from that. And they were the only vessel. And that was the reason why that was done, to help that help that guy accommodate his expansion to statewide waters. Let's not forget the Hulses. It's not like when you say they're expanding. They've been out statewide waters. They were pioneers in this issue. They fished out there for many years prior to the set of circumstances that kind of kept them off the water for a few years. It's not like this is something where they've never fished out there. They fished out there for many years. There are others that historically fished and didn't fish at all during these three years. And they're out completely. Your honor, if you look at table ER 146, table 3.4.1, what you'll see is that after that Mr. Big incident, where they had to close the fishery for a year and a half, half the vessels left the fishery. They didn't leave it because of the LLP. They left because the fishery was closed for a year and a half. They had to go do something else, and they found something else to do. There were no vessels. The LLP did not really cut out anybody, at least as far as the vessels that had formerly fished the statewide waters. There was one vessel that tried to get out from Coquitlam and claimed it had some landing that I think turned out not to be true. But the LLP by itself didn't throw anybody out, except it pinned the hulses into Coquitlam where they can't make a living. Thank you.  It matters. Just a minute.
judges: Pregerson, Canby, McKeown